UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Mark Faulkner, | : Case No. 1:14-cv-758 |
| Plaintiff, | : |
| vs. | : |
| University of Cincinnati, Santa J. Ono, Donna Bowman, and Erin Ascher, | : |
| Defendants. | : |

**ORDER**

Before the Court are two motions to dismiss Plaintiff's complaint, one filed jointly by the University of Cincinnati, Donna Bowman, and Erin Ascher (Doc. 5), and one by Santa J. Ono (Doc. 6). Plaintiff opposes both of the motions (Docs. 11 and 12), and Defendants have each filed a reply. (Docs. 13 and 14)  Plaintiff has also filed a motion for leave to amend his complaint (Doc. 7), which is not opposed and which is granted.

For the following reasons, the Court will grant in part and deny in part Defendants' motions to dismiss.

**FACTUAL BACKGROUND**

Mark Faulkner is employed by the University of Cincinnati as Senior Associate Vice President in the University's Department of Information Technology.  He has been employed at UC since 1985 in various capacities.  Santa J. Ono is the President of UC; Donna Bowman is the Assistant Director of the University's Office of Equal Opportunity and Access; and Erin Ascher is the University's Chief Human Resources Officer.  All the individual Defendants are sued in their official capacities only.

As alleged in his amended complaint, Faulkner was invited to serve on the steering committee for the IT Department's Leadership Academy. Participants in the Academy were expected to attend monthly meetings designed to enhance leadership skills. The Department retained an outside management consultant to help organize and facilitate this project. Participation in the Academy was voluntary, and was not a requirement of Faulkner's position. The first Academy meeting took place off-campus on September 17, 2013. Faulkner alleges that during this all-day meeting, he gave a lecture on "Servant Leadership," a philosophy which "... emphasizes shared power and putting the needs of others first to ensure that all members of the group develop and perform as highly as possible. Consistent with his Christian belief system and practices, Mr. Faulkner relied on numerous Biblical references in order to illustrate his ideas and explain his views about servant leadership. He made clear, however, that his views on Christianity were solely his own and did not reflect the University's position on religion." (Doc. 7-1, ¶16)

Five months later, on February 27, 2014, Faulkner received a memorandum from Donna Bowman, stating that the University had conducted an investigation arising from his religious references in his September 17 speech.[1] The memorandum states that on October 22, 2013, Bowman was notified that a complaint about "employee misconduct" had been filed against Faulkner and Nelson Vincent, a Vice President and Chief Information Officer, based on their IT Leadership Academy presentation. Bowman

---

[1] Faulkner did not attach this memorandum to his complaint, but he quoted from it and his claims arise from it. The UC Defendants filed the memorandum with their motion (Doc. 5, Ex. A), and the Court may consider it in ruling on the motions.

stated that it had been "confirmed that religion and politics were brought up directly and indirectly" during the Leadership Academy session. She further stated that "By his own admission, Mark Faulkner did quote from the Bible based upon his own beliefs which he stated these were his, and only his examples [sic]." Neither Faulkner's complaint nor Bowman's memorandum describes what Faulkner (or Vincent) actually said during the presentation, or the nature of the "employee misconduct" complaint that was lodged against them. Bowman determined that Faulkner had violated the University's Affirmative Action EEO procedures, its non-discrimination policy, and its discriminatory harassment policy. Copies of the three written policies are attached to the amended complaint as Exhibits C, D, and E. Bowman's memorandum acknowledged that Faulkner made clear that his statements and Bible quotations were based solely upon his own beliefs; nevertheless, Bowman instructed him that "going forward, Mr. Faulkner should refrain from using biblical quotations during presentations and work related interactions." She also directed him to attend a departmental training session on "Sensitivity and Cultural Differences." (Doc. 7-1 at ¶18)

      Faulkner objected to being disciplined on the basis of his religious expression. Thereafter, Erin Ascher informed him that she had requested the University's Office of General Counsel to further review and consider the matter. On August 22, 2014, the University affirmed its decision to "ban Mr. Faulkner from using biblical quotations during future lectures or in work related interactions." (Id. at ¶20) Faulkner alleges that these actions have an "immediate and foreseeable long term effect of inhibiting and chilling employees of the University, including Mr. Faulkner, from freely exercising their religion and/or their freedom of speech." (Id. at ¶21)

Faulkner brings claims against the Defendants for violating his right to free speech protected by the First and Fourteenth Amendments (Count One): violating his right to freely exercise his religion (Count Two); a Title VII claim against the University only, alleging discrimination based on his religious expression (Count Three); and two due process claims alleging that the three University policies Bowman cited are void for vagueness (Count Four) and overbroad (Count Five). He seeks an injunction prohibiting the enforcement of the policies regarding his religious speech and expression, and vacating the disciplinary action taken against him, together with damages and attorney's fees.

The UC Defendants (the University, Bowman and Ascher) argue that Faulkner has not alleged an actionable First Amendment claim. Faulkner's speech was made in his capacity as an employee of the University, during a University-sponsored training program for its departmental employees and staff. The First Amendment protects a public employee's speech when he speaks as a citizen on matters of "public concern." Connick v. Myers, 461 U.S. 138, 146-47 (1983). But that protection does not extend to speech that is made as part of the employee's job duties. Garcetti v. Ceballos, 547 U.S. 410, 421 (2006). For similar reasons, UC argues that Faulkner's free exercise and due process claims, which allege that the University's non-discriminatory policies are unconstitutional, should be dismissed. The activity in which Faulkner participated was a workplace leadership training, designed to improve the IT department. An employer's interest in protecting and promoting its own mission and objectives outweigh an employee's right to self-expression in such circumstances. With respect to Faulkner's Title VII claim, the University argues that he did not suffer an actionable adverse

employment action.  Requiring him to attend a training session (as was also required for several of his colleagues) is not an adverse action, because it was not a significant change in his employment status.  Faulkner does not allege that the ban on biblical quotations or the training requirement negatively affected his performance evaluation, or that his wages or benefits were affected in any way.

Faulkner responds that his two First Amendment claims must be separately analyzed, because they involve different considerations.  He contends that Garcetti did not arise in a context of religious expression, and nothing in that opinion should foreclose his free exercise claim.  To accept Defendants' argument that both his free speech and free exercise claims are barred by his employment status would permit unfettered regulation of a public employee's religious speech.  Faulkner suggests that a balancing test should apply to determine if the Defendants' interests in prohibiting his religious speech in "any work related interactions" outweigh his own interests in freely exercising his religious expression rights.  UC's extremely broad ban could apply to interactions that do not involve his official job duties nor implicate any important interests of the University.  Faulkner cites cases finding that an employee's religious speech rights can outweigh government interests when there is no workplace disruption, and no realistic potential for an Establishment Clause violation.  That balancing test requires a more developed factual record, and cannot be determined on the pleadings.

With respect to his vagueness and overbreadth claims, Faulkner cites cases finding that a university's policy may be enjoined on these grounds.  See, e.g., Dambrot v. Cent. Michigan Univ., 55 F.3d 1177, 1182-84 (6th Cir. 1995), striking down a

university's policy banning discriminatory harassment as overbroad. Concerning his Title VII claim, Faulkner cites Tepper v. Potter, 505 F.3d 508, 514 (6th Cir. 2007), holding that an employee's failure to accommodate claim requires him to show only that (1) he holds a sincere religious belief that conflicts with an employment requirement; (2) he told his employer about the conflict; and (3) he was discharged or disciplined for failing to comply with that requirement. Faulkner argues that he need not show that he suffered an "adverse employment action," but only that he was "disciplined." Faulkner's religious belief includes freely discussing the Bible in all aspects of his daily life. UC prohibited him from making Biblical references in any "work related interactions," and required him to attend a "sensitivity" training session. He argues that these disciplinary actions are sufficiently pled to allow him to proceed on his Title VII claim.

President Ono's motion argues that Faulkner's complaint lacks facts to support a plausible claim against Ono. Faulkner does not allege that Ono was involved in adopting the policies he challenges, the IT department's leadership academy, or the University's investigation into Faulkner's speech. Any claim for monetary damages against Ono, who is sued in his official capacity only, is barred by the Eleventh Amendment, because the University is an instrumentality of the State of Ohio.

Faulkner acknowledges that he cannot recover damages against Ono. He argues that he is seeking prospective injunctive relief against the University's prohibition on using biblical quotations, and the enforcement of the University's policies insofar as they infringe protected First Amendment rights. The Eleventh Amendment does not bar claims against state officials sued in their official capacity for such prospective relief. Faulkner contends that Dr. Ono, as President of the University, is ultimately responsible

for the enforcement of those policies. Faulkner also suggests that it is reasonable to infer that Dr. Ono, as President, is arguably in the best position to provide the injunctive relief Faulkner seeks.

## ANALYSIS

Standard of Review

In reviewing a motion to dismiss under Rule 12(b)(6), the Court accepts the complaint's well-pleaded factual allegations. A claim will survive if those allegations are "enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." Jones v. City of Cincinnati, 521 F.3d 555, 559 (6th Cir. 2008), citing Bell Atlantic Corp. v. Twombly, 550 U.S.544 (2007). Twombly essentially retired Rule 8's permissive "no-set-of-facts" pleading standard set forth in Conley v. Gibson, 355 U.S. 41, 45-46 (1957). The Twombly court found that literal application of that standard impermissibly permits wholly conclusory claims to survive Rule 12 challenges.

In Ashcroft v. Iqbal, 556 U.S. 662 (2009), the Supreme Court expressly held that a complaint will survive a Rule 12 challenge only if its well-pleaded factual allegations are sufficient to state a claim for relief that is plausible on its face. Facial plausibility requires pleading facts that permit a reasonable inference that the defendant is liable for the alleged misconduct. If a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" Id. at 678 (quoting Twombly, 550 U.S. at 557).

Faulkner's Claims against Dr. Ono

The Court concludes that Faulkner's amended complaint fails to allege a

-7-

plausible claim for relief against Dr. Ono. Faulkner alleges no facts suggesting that Ono was involved in or even aware of any of the events giving rise to Faulkner's claims. Faulkner cites a University rule that provides the President with ultimate authority to "maintain discipline" or to "suspend any employee." As the highest official at the University, it is likely the case that Dr. Ono has authority to enforce myriad rules and regulations. But that general authority is not enough to support an official capacity claim against him arising from the specific constitutional violations that Faulkner alleges in his complaint. Moreover, the Court can discern no basis upon which to conclude that if Faulkner should prevail on his injunctive relief claims, the absence of the President as a named defendant would prevent the Court from granting him full relief. Defendants Bowman and Ascher are both sued in their official capacity in Faulkner's injunctive relief claims, and such a suit is effectively a suit against the University itself.

For these reasons, Faulkner's claims against Dr. Ono will be dismissed.

First Amendment Claims

The initial question in considering Faulkner's claims is to determine whether Faulkner was engaged in activity protected by the Free Speech clause of the First Amendment. The answer to that question is guided by three leading Supreme Court cases that define the contours of the free speech rights of public employees: does the speech involve a "matter of public concern" (Connick v. Myers, 461 U.S. 138 (1983)); and is the speech made by the employee as a private citizen and not pursuant to the employee's official duties (Garcetti v. Ceballos, 547 U.S. 410, 413-414 (2006)). If both these are true, the court applies a balancing test to determine whose interests should prevail in any given situation (Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968)). See

Evans-Marshall v. Bd. of Ed. of Tipp City, 624 F.3d 332, 338 (6th Cir. 2010), articulating this three-step analysis. These are issues of law for the court to decide, if there is no substantial dispute about whether the speech actually happened or what was said. Farhat v. Jopke, 370 F.3d 580, 589-593 (6th Cir. 2004).

In Garcetti, the plaintiff (Ceballos) was an assistant district attorney and calendar deputy who exercised supervisory responsibilities over other lawyers in the DA's office. An attorney representing a criminal defendant in a pending case called Ceballos about the attorney's intent to file a motion challenging a search warrant affidavit. He asked Ceballos to review the case, which Ceballos did by reading the affidavit, speaking with the affiant (a sheriff's deputy), and investigating the site of the search. Ceballos concluded that the affidavit contained misrepresentations, and wrote a memo to his supervisors recommending that the criminal case be dismissed. A subsequent meeting between Ceballos and his supervisors, and the warrant affiant and several sheriff's employees, became rather heated after a sheriff's lieutenant criticized Ceballos' handling of the case. The district attorney proceeded with the prosecution, and in a subsequent hearing challenging the search warrant, Ceballos was called by defense counsel to testify about his concerns about the affidavit. Ceballos was later reassigned to a different position, transferred to a different courthouse, and denied a promotion.

Ceballos filed a lawsuit alleging these actions were unlawful retaliation for his protected speech. His lawsuit was dismissed by the district court, which concluded that his speech was not protected by the First Amendment. The Ninth Circuit reversed, but the Supreme Court vacated that decision and affirmed the district court. The Court held that Ceballos' memo was written as part of his normal duties as a prosecutor and

calendar deputy: "Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created ...". Id. at 421-422.

Faulkner does not dispute that his speech was made in a university-sponsored setting, and that he was acting within the scope of his duties as a member of the IT department when he attended the Leadership Academy conference. His complaint specifically alleges that the academy was established by UC "for the purpose of motivating and promoting excellence in organizational and management skills for the betterment of the employees and the department as a whole." (Doc. 7-1 at ¶14) The fact that the academy was held on a weekend, and that attendance was not part of Faulkner's regular job duties, is not dispositive. "Speech by a public employee made pursuant to ad hoc or de facto duties not appearing in any written job description is nevertheless not protected if it 'owes its existence to [the speaker's] professional responsibilities.'" Weisbarth v. Geauga Park Dist., 499 F.3d 538, 544 (6th Cir. 2007)(quoting Garcetti), finding that a park ranger's statements about morale and performance issues to an outside consultant hired by her employer were made pursuant to her official duties, even though the interview was an ad hoc duty and not part of her official job description.

In contrast, in Westmoreland v. Sutherland, 662 F.3d 714 (6th Cir. 2011), the plaintiff was a member of a city's fire department and had been the head of the department's disbanded rescue dive team. After the team was disbanded by the city council, a young boy drowned in a lake. Westmoreland appeared at a subsequent city

-10-

council meeting, off duty and not in uniform, and harshly criticized the City's decision to disband the team, asserting that the dive team could have saved the young boy. The City's Mayor concluded his statements constituted insubordination and conduct unbecoming an officer, and he was disciplined. The district court found that his statements were on a matter of public concern and that plaintiff spoke "as a citizen," and his speech was protected by the First Amendment. But the district court concluded that his statements were knowingly false and reckless in essentially accusing the City Council of causing the boy's death, and granted judgment to the City on that basis. The Sixth Circuit agreed that Westmoreland's speech was protected by the First Amendment: "Although plaintiff identified himself as a public employee, he appeared off duty, out of uniform, and at a public meeting to address the Mayor and City Council during the public comment period. Nothing in the record supports the claim that plaintiff's expression was made pursuant to a task that was within the scope of his official duties." Id. at 719. The court of appeals then reversed the grant of summary judgment, finding disputed issues of fact about whether Westmoreland knowingly made false and reckless statements.

These cases support Defendants' contention that Faulkner's speech was made within the scope of his duties. Faulkner does not suggest that the Leadership Academy was a classroom or a functional equivalent of a classroom, or that he was teaching students. His complaint does not directly implicate the Supreme Court's concern that its analysis in Garcetti might not apply to situations involving restrictions on academic freedom: "There is some argument that expression related to academic scholarship or classroom instruction implicates additional constitutional interests that are not fully

accounted for by this Court's customary employee-speech jurisprudence. We need not, and for that reason do not, decide whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching." Garcetti, 547 U.S. at 425.

The Court concludes that Faulkner was not speaking as a private citizen on a matter of public concern when he gave his presentation to the IT Leadership Academy. Therefore, that speech was not protected by the First Amendment, and he cannot challenge the "discipline" that resulted - his attendance at a "sensitivity" seminar. But this conclusion does not require the dismissal of the entirety of his First Amendment claims. Faulkner is also challenging the University's prohibition on making any biblical quotations in "future lectures or in work related interactions." This broadly worded ban could apply to consensual conversations with colleagues, to religious symbolic speech, and to "interactions" of all sorts that might occur outside of the classroom or officially sanctioned University-sponsored groups.

All of the cases discussed above recognize that a public employee does not give up all First Amendment protections simply by virtue of his public employment. "Many citizens do much of their talking inside their respective workplaces, and it would not serve the goal of treating public employees like any member of the general public ... to hold that all speech within the office is automatically exposed to restriction." Garcetti, 547 U.S. at 420-421 (internal quotation and citation omitted). Faulkner cites Tucker v. California Dep't of Educ., 97 F.3d 1204 (9th Cir. 1996), where the court held that a public employer's complete ban on religious speech and advocacy at work violated the plaintiff's First Amendment rights, because the ban was overbroad and did not

-12-

adequately serve the state's interest in remaining neutral on religious matters. The plaintiff was a computer analyst for the state Department of Education, who was prohibited from "initiating or promoting" religious discussion at work, and displaying any religious books, pictures or symbols outside of his office partition walls. The ban was later extended to all employees. Applying the Pickering balancing test, the court of appeals held that the Department failed to establish any conceivable danger that plaintiff's personal religious advocacy could be understood as representing the views of the state. It held that the ban was overly broad because it reached plaintiff's protected religious expression.

The UC Defendants cite Piggee v. Carl Sandburg College, 464 F.3d 667 (7th Cir. 2006) to argue that the entirety of Faulkner's First Amendment claims should be dismissed. That case involved a lawsuit brought by a community college cosmetology teacher, a Christian who believed that homosexuality is a sin. When the teacher learned that one of her students was gay, she gave him some pamphlets advocating the belief that homosexuality is an abomination, and suggesting that gay males were dangerous. The student complained to the college, who investigated the teacher's conduct. She did not deny the student's report, and the college concluded that she had been proselytizing to that student in the classroom, and had sexually harassed him. She was instructed to cease and desist from all such conduct or face disciplinary action. When the college decided not to renew her contract the following semester, she sued alleging her First Amendment rights had been violated. The Seventh Circuit affirmed the district court's grant of summary judgment to the defendants. Even though religion or views on homosexuality "richly deserve full public discussion, ... the real question ...

-13-

is whether the college had the right to insist that Piggee refrain from engaging in that particular speech while serving as an instructor of cosmetology." Id. at 671. The court held that the college had that right because the college "had an interest in ensuring that its instructors stay on message" in the classroom and while teaching students. Piggee's speech was not related to her job, and it actually interfered with her ability to perform as reflected by the number of other students who reported that they were offended by her religious proselytizing in class.

Here, there is no suggestion that Faulkner inserted his religious beliefs into his classroom teaching or his interactions with students. The plaintiff in Piggee sought damages and reinstatement, while Faulkner is seeking prospective injunctive relief against the broad ban on his religious speech. Moreover, Piggee was decided on summary judgment; this case is at the pleading stage, and the record is undeveloped concerning the specific content of Faulkner's speech, the nature of the complaint received by UC, and the parties' competing interests in the prohibition imposed on Faulkner. To this extent, the Court will deny the UC Defendants' motion to dismiss, and allow Faulkner to proceed on his claim that the broad prohibition on speech that was imposed upon him violates his First Amendment rights.

Title VII

The University seeks dismissal of Faulkner's Title VII claim, arguing that he did not suffer an adverse employment action, one of the requirements of a prima facie case. Faulkner responds that he was disciplined: UC required him to attend a sensitivity training seminar, and banned him from using biblical quotations in work related interactions. Faulkner cites Reed v. Int'l Union, United Auto., Aerospace & Agr.

Implement Workers of Am., 569 F.3d 576 (6th Cir. 2009), and Tepper v. Potter, 505 F.3d 508 (6th Cir. 2007), to argue that these are sufficient to support his Title VII claim. But these cases actually support UC's position. In Reed, the plaintiff objected to paying union dues on the basis of his religious beliefs. The union granted his request to be treated as a religious objector and allowed him to pay only agency fees to the union, with the rest to be paid to an agreed charity. He then objected to paying even the fees, and the union permitted him to pay the entire amount to that charity. But he discovered that his ongoing monthly obligation to the charity was higher than what he would have paid if he had opted to remain an objecting member of the union. He sued the union, arguing it failed to reasonably accommodate his religious beliefs. The Sixth Circuit affirmed the district court's judgment to the union, finding that the accommodation granted to the plaintiff did not rise to the level of an adverse employment action. There was no action taken by the union that adversely affected the terms and conditions of his employment.

And in Tepper v. Pepe, plaintiff was a postal worker who observed the Saturday Sabbath as part of his religious beliefs. For some time the post office had accommodated Tepper by giving him every Saturday off, because high staffing levels allowed the office that flexibility. But after staff levels were reduced, Tepper's supervisor told him that he would have to reserve vacation, annual and unpaid leave, or exchange days off with other employees, in order to continue to have every Saturday off. Tepper argued that this was a form of discipline that was sufficient for his Title VII accommodation claim. The Sixth Circuit disagreed, holding that "more than loss of pay is required to demonstrate discipline or discharge." Id. at 514.

A similar result was reached in <u>Mitchell v. University Medical Center</u>, 2011 U.S. App. LEXIS 26546 (6th Cir., Aug. 10, 2011).  Mitchell worked as a nurse at the medical center, and she and other employees often discussed their Christian faith while at work.  One night while reading the Bible, Mitchell believed that God had revealed to her some "calculations" of important dates, such as the date of the end of the world or the coming of the Anti-christ.  She shared her "calculations" with many of her co-workers, who became concerned about Mitchell and reported their concerns to her supervisor.  The supervisor suggested that Mitchell speak with the Employee Assistance Program, and told her that she must not share her "calculations" at work because it alarmed her co-workers, making them feel uncomfortable.  Mitchell refused to stay silent and threatened to resign.  Her supervisor refused her resignation and urged her to think about the situation overnight.  Mitchell submitted her resignation a few days later, and then brought a lawsuit under the Kentucky Civil Rights Act, which like Title VII prohibits religious discrimination.  The Sixth Circuit held that her accommodation and discrimination claims failed for the same reason: "although she insists otherwise, the Hospital's direction to Mitchell - refrain from discussing during work hours the calculations God showed her - is not a form of discipline forbidden by Title VII. ... [because] the 'discipline' element of an accommodation claim must, at least, rise to the level of an 'adverse employment action' element of a discrimination claim." <u>Id</u>. at *7.

Faulkner has not been "disciplined" in any actionable way.  He and other members of his department were required to attend a sensitivity seminar, but he does not allege that this attendance amounted to a materially adverse change in the terms or conditions of his employment.  Similarly, the Court finds that the challenged ban on

using "biblical quotations" is not a **material** change in the terms of his **employment** that could permit Faulkner to proceed on a Title VII claim.

Claims Challenging the University's Policies

Faulkner alleges that the University's policies cited in Bowman's memorandum are both vague and overbroad. The UC Defendants argue that those doctrines are inapplicable in this case, because they are intended to protect citizens from criminal prosecution. It is true that overbreadth and vagueness may be raised in defense of a criminal prosecution. See, e.g., Wisconsin v. Mitchell, 508 U.S. 476, 481-482 (1993), finding that a state sentencing enhancement statute was not overbroad and did not infringe the defendant's First Amendment rights.

But that does not preclude Faulkner from raising these arguments in this case regarding the University's policies he challenges. It is clear that the constitutional doctrines of vagueness and overbreadth can be raised in civil suits challenging statutes, ordinances, and a state university's rules and policies. See, e.g., Savage v. Gee, 665 F.3d 732, 740-741 (6th Cir. 2012), affirming the dismissal of a former Ohio State librarian's facial and as-applied challenges to the University's sexual harassment policy because, as a former employee, he lacked standing and could not demonstrate imminent or future harm. This suggests that someone with standing, who could plausibly allege future harm from enforcement of a vague or overbroad policy, could proceed.

See also, Dambrot v. Cent. Michigan Univ., 55 F.3d 1177 (6th Cir. 1995), where the Sixth Circuit affirmed a district court's judgment finding the university's anti-discrimination policy to be overbroad and unconstitutionally vague. The court found that

the policy "sweeps within its ambit both constitutionally protected activity ... and unprotected conduct, making is subject to an overbreadth challenge." Id. at 1183 (internal citation omitted).

Bowman's memorandum to Faulkner cited three University policies he allegedly violated by giving his speech to the Leadership Academy. Bowman cites the Affirmative Action policy, which requires each employee to treat others with "respect and dignity." The non-discrimination policy reflects UC's commitment to provide "an inclusive environment free from invidious discrimination in all of its forms. The university reaffirms its policy that discrimination on the basis of religion shall not be practiced in any of its activities." And the discriminatory harassment policy prohibits conduct "that has the purpose or foreseeable effect of unreasonably interfering with an identifiable individual's work or academic performance or of creating an intimidating, hostile, or offensive work or learning environment for that individual." (Doc. 5, Ex. A) The UC Defendants cited these policies as the basis for imposing a ban on biblical quotations in "future lectures and all work related interactions."

At the pleading stage of this case, it is plausible that these policies, like the one at issue in Dambrot, could "sweep within [their] ambit both constitutionally protected activity ... and unprotected conduct." Therefore, the Court will deny the motion to dismiss Counts Four and Five of Faulkner's complaint.

## CONCLUSION

Plaintiff's unopposed motion for leave to file his amended complaint (Doc. 7) is granted. Defendant Ono's motion to dismiss (Doc. 6) is granted. Plaintiff's claims against Ono are dismissed with prejudice. The UC Defendants' motion to dismiss (Doc.

5) is granted in part and denied in part, for the reasons set forth in this Order.

    SO ORDERED.

DATED: March 23, 2015                            <u>s/Sandra S. Beckwith</u>
                                                                         Sandra S. Beckwith, Senior Judge
                                                                         United States District Court