UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Mark Faulkner,                              :        Case No. 1:14-cv-758
                                            :
        Plaintiff,                          :
                                            :
vs.                                         :
                                            :
University of Cincinnati, et al,            :
                                            :
        Defendants.                         :

**ORDER**

Before the Court is the Defendants' motion for summary judgment.  (Doc. 35)

Defendants seek judgment on Plaintiff's First Amendment claim, and his claims

challenging the University of Cincinnati's discriminatory harassment policies as

unconstitutionally vague and overbroad.  Plaintiff opposes the motion (Doc. 36), and

Defendants have filed their reply (Doc. 37).  For the following reasons, the Court will

deny Defendants' motion.

Factual Background

Mark Faulkner worked at the University of Cincinnati in various non-faculty

positions from 1985 through July 2015.  Faulkner retired from his position as Senior

Associate Vice President in the University's Department of Information Technology in

July 2015.  He immediately began work as a consultant to the University, at the request

of his departmental director, Dr. Nelson Vincent.  Faulkner entered into a consulting

agreement with Insight Global, initially working part-time training staff and aiding Dr.

Vincent in transition tasks.  In September 2015, Faulkner agreed to assume the duties

of a UC Assistant Vice President who took an unexpected medical leave.  Faulkner

currently supervises five people in this position.

Faulkner's lawsuit arises from events that began in 2013.  The IT department decided to develop and institute a "Leadership Academy" to provide training to departmental staff on leadership skills.  An outside consultant, Megan Clark, was hired to develop a curriculum for the Academy and to run the sessions.  Faulkner was appointed to a committee responsible for developing the Academy, but he did not participate in selecting the individuals who would provide the training and lectures.  The first year's group of trainees (for which there were more applications than spaces available) was composed of Dr. Vincent's direct reports, and individuals who reported to those people.  Clark asked Faulkner if he would give a lecture to the first meeting of the Academy on the subject of "servant leadership."  Dr. Vincent described the philosophy of "servant leadership" as a management style focused on empowering others to effectively perform their jobs. (Vincent Dep. at 13)  Faulkner was reluctant to give the lecture but eventually agreed to do so.

The first session of the Academy was held on September 17, 2013.  Clark led an "icebreaker" exercise to begin the day's session.  She asked the participants to respond to a series of words and phrases by moving out of a line in one direction or the other, based on their reactions to the words.  The words and phrases she used included phrases such as "I am a Republican," "I am a Christian," and "I am shy."  Faulkner made a short presentation in the morning, and gave his "Servant Leadership" talk after lunch, using a written outline as a guide.  His presentation included a video excerpt of a speech by Dr. Martin Luther King; references to a book about the Southwest Airlines business model and successful growth; a pamphlet called "The Servant as Leader;" and

-2-

several references to Jesus, including his directive to lead by service, and a story from the Book of Matthew.  Faulkner described Jesus as an example of a leader who articulates "clear and crisp" values.  He specifically stated that his views about religion and Jesus were his own views that guided his own life, and were not those of the University nor of the audience.  Faulkner recalls that approximately 20-22 departmental members were present, and none of them expressed any objections or discomfort about anything that he said during his presentation or during the conference.

About a month later, in October, Donna Bowman, UC's Assistant Director of the Office of Equal Opportunity and Access, received an anonymous complaint alleging that "religion and politics were brought up" during the icebreaker session of the Academy on September 13.  The anonymous complaint identified Faulkner and Nelson Vincent as responsible for these transgressions.  Bowman began investigating the anonymous complaint and chose to interview two attendees, Melissa Berling and Josette Riep, as well as Faulkner, Dr. Vincent, and Megan Clark.  Bowman chose Berling and Riep because she had worked with them in the past on other issues. Bowman testified that "employees were saying that they felt that [the Academy] was a revival" and that Faulkner had proclaimed he was "there that day because God had called him there." (Bowman Dep. at 27)  Berling claimed that "somebody asked for amens," but no one else Bowman interviewed confirmed that claim.

Bowman called Faulkner one day in early 2014 and said she needed to speak with him that morning.  According to Faulkner, she asked if he had heard the "servant leadership" presentation in church, whether he had "anointed himself" as a leader, and if he had asked the group for an "Amen."  Faulkner denied saying these things, and felt

-3-

that Bowman was attacking him.  He offered to give her a copy of his written outline, but he testified that she never followed up with him in order to obtain it.

Bowman completed her investigation and recommended that "corrective action" be taken.  Her letter/report is dated February 27, 2014 and is addressed to Faulkner and Vincent.  Bowman stated that she was notified of a complaint of "employee misconduct" against both of them.  After investigating the complaint, she concluded that "corrective action by the University is warranted."  She concluded that UC's Affirmative Action/EEO procedures, non-discrimination policy, and the discriminatory harassment policy were violated during the Leadership Academy, because "religion and politics were brought up directly and indirectly during the ice-breaker session ...".  With respect to Faulkner, the letter stated: "By his own admission, Mark Faulkner did quote from the Bible based upon his own beliefs which he stated were his, and only his examples.  Going forward, Mr. Faulkner should refrain from using biblical quotations during presentations and work related interactions."  Bowman also recommended that the entire department participate in a "Sensitivity and Cultural Differences" training program within the next six months.  (Faulkner Dep. Ex. 4A)

Bowman initially testified in her deposition that Faulkner's actions did not violate any University policies, but that "his actions made some employees feel uncomfortable based on his religious statement. ... We ask that our management not make the work environment noninclusive for employees."  (Bowman Dep. at 33-34.)  Both her letter and her later testimony make clear that she concluded that Faulkner violated the University's discriminatory harassment policy because his comments "made their employees feel uncomfortable ..." and "... creates a workplace which can be considered hostile to

perhaps an atheist that could have been in the audience." (Bowman Dep. at 39)

Faulkner was concerned about Bowman's letter, and worried that the episode and the "corrective action" would reflect badly on him, or result in some negative perceptions about him or his abilities. He also testified that he was told he could not give his "Servant Leadership" presentation to future Leadership Academy classes. (Faulkner Dep. at 87-88) He discussed the situation with his colleague Josette Riep (whom Bowman conceded did not share Berling's complaints about Faulkner's presentation), who suggested that he contact Bluzette Marshall, UC's Chief Diversity Officer. He did so and met with Marshall, showed her the letter from Bowman, and discussed his concerns. Marshall offered to meet with UC's Human Resources group to discuss Faulkner's concerns. Marshall testified that she reviewed Bowman's letter and listened to Faulkner's description of receiving it, and felt as though there was a "disconnect" in communications, and she wanted to understand more about the situation. (Marshall Dep. at 22) Marshall offered to help facilitate a discussion about Faulkner's concerns, and she contacted Bowman, Erin Ascher (Bowman's supervisor), and Tanya Ladd, all three of whom were signatories on Bowman's February 27 letter.

Marshall subsequently met with Bowman and Ladd; Erin Ascher, the HR Director, had planned to attend but was not available at the last minute. Marshall wanted to learn more about the circumstances leading to Bowman's letter, and shared her concerns about the prohibition on Faulkner's speech. Bowman and Ladd did not share any information about the situation with Marshall, so Marshall sent a follow-up email to Ascher, Bowman and Ladd, suggesting that the letter be revised to alter the prohibition on "biblical references." (Marshall Dep. at 30-32) Asher responded to

-5-

Marshall by saying it was inappropriate for her to contact Ascher's staff directly, and that further conversations should take place "offline." (Id. at 33) Marshall then met with Bob Aumbach, UC's Vice President for Administration and Finance and Ascher's supervisor. Aumbach did not give Marshall any information about Faulkner or the February 27 letter, but told Marshall that the letter would not be placed in Faulkner's personnel file. Marshall was also involved in a subsequent meeting with Ascher, Ambach, Faulkner, and representatives of the General Counsel's office. (Marshall Dep. at 39-40)

Ascher sent a letter to Faulkner and Nelson on June 24, 2014, stating that concerns about Bowman's letter had come to her attention. Given those concerns, Ascher asked the University's Office of General Counsel to assist in further review of the situation. She invited Faulkner and Vincent to contact her or Kenya Faulkner, VP of Legal Affairs, if they had further questions or concerns. (Bowman Dep. Ex. E)

Faulkner filed his original complaint on September 25, 2014 against the University of Cincinnati, its President Santa Ono, Donna Bowman and Erin Ascher. The individual defendants are all sued solely in their official capacity. All of the Defendants moved to dismiss Faulkner's claims on a variety of grounds. This Court granted in part and denied in part the motions, dismissing all claims against President Ono, and Faulkner's Title VII claim against the University. The Court dismissed a portion of Faulkner's First Amendment claim under Garcetti v. Ceballos, 547 U.S. 410 (2006), after concluding that he was not speaking as a private citizen on a matter of public concern when he gave the presentation.

However, the Court denied dismissal of the entirety of this claim, finding that the broadly worded ban on any biblical references in "... future lectures or in work related

interactions ... could apply to consensual conversations with colleagues, to religious symbolic speech, and to 'interactions' of all sorts that might occur outside of the classroom or officially sanctioned University-sponsored groups." (Doc. 15 at 12) Faulkner is seeking prospective injunctive relief against this broad ban, and the Court allowed his claim to proceed. The Court also denied dismissal of Faulkner's constitutional challenges to the University policies cited in Bowman's letter, finding that the doctrines of vagueness and overbreadth may be raised in civil suits such as this.

Following entry of this Order on March 23, 2015, the parties participated in a mediation session with Magistrate Judge Wehrman. They were not successful in resolving the suit; but later the same day, July 23, 2015, Faulkner received a letter from Bowman "amending" her February 27, 2014 "corrective action" letter. Bowman's letter informed Faulkner: "The sentence reading 'Going forward Mr. Faulkner should refrain from using biblical quotations during presentations and work related interactions' is removed. The sentence should be substituted with the following: "Going forward, Mr. Faulkner should be mindful of how his comments can be interpreted by his colleagues and be respectful that they may have different views." (Doc. 32-1, Faulkner Dep. Ex. 6)

## DISCUSSION

Summary Judgment Standards

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An assertion of an undisputed fact must be supported by citations to particular parts of the record, including depositions, affidavits, admissions, and interrogatory answers. The party opposing a properly supported

summary judgment motion "'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (internal quotation omitted).

The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc., 276 F.3d 845, 848 (6th Cir. 2002). Once that occurs, the party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989).

The burden is on the non-moving party to "present affirmative evidence to defeat a properly supported motion for summary judgment...," Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989), and to designate specific facts in dispute. Anderson, 477 U.S. at 250. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industries Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The court must assess "whether there is the need for trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250. "If the evidence is merely colorable, ... or is not significantly probative, ... the court may grant judgment." Anderson, 477 U.S. at 249-50 (citations omitted).

-8-

The court construes the evidence presented in the light most favorable to the non-movant and draws all justifiable inferences in the non-movant's favor.  United States v. Diebold Inc., 369 U.S. 654, 655 (1962).

Standing: Defendants contend that because Faulkner retired from his official position at the University in July 2015, he no longer has standing to pursue his claims challenging the University's policies.  They cite Savage v. Gee, 665 F.3d 732 (6th Cir. 2012), where the court of appeals affirmed the dismissal of a former professor's claims against the university because he resigned from the faculty after he filed suit.  He had no continuing employment relationship with the University, and could not show that he had a reasonable expectation of any imminent enforcement of the challenged harassment policies against him.  And the prior investigation of the professor's conduct was not the type of concrete harm sufficient to confer standing in view of his departure.

The Court concludes that Faulkner's retirement does not deprive Faulkner of standing to prosecute his claims in this case.  Immediately upon his retirement, he became a University consultant and has continued working on campus and in the IT department.  Bowman testified that the University's anti-discrimination and anti-harassment policies apply to all University consultants and contractors, and that the University does not want "any incidents going forward" with regard to Faulkner. (Bowman Dep. at 68-69)  Faulkner's paycheck is coming through a different source, but that does not exempt him, as an on-campus consultant, from complying with all University policies and procedures.

The Court also rejects the Defendants' suggestion that Bowman's retraction of the broad ban on biblical references (and its replacement with an admonishment to "be

respectful" of his colleagues' view) disposes of or moots Faulkner's claims.  As Faulkner persuasively argues, the circumstances surrounding Bowman's initial investigation give rise to a reasonable inference of a less than thorough or objective investigation of one anonymous complaint.  Bowman chose to interview only two of the more than 20 attendees simply because she knew those two women.  Only one of the two described Faulkner's presentation as a "revival" and ascribed comments to Faulkner that neither Vincent nor Riep recalled.

Moreover, after Marshall attempted to discuss Faulkner's concerns with Ascher and Bowman, she was told that such conversations must occur "offline."  Faulkner was then informed that the General Counsel's office would review Bowman's "corrective action" letter.  Yet it was not until over a year later, on the very day of an unsuccessful mediation, that Bowman actually amended the letter.  While the Defendants insist that the timing is only related to Faulkner's retirement, the facts give rise to more than one reasonable inference about the Defendants' intent and motive in issuing the amendment.

Moreover, as Faulkner notes, a defendant may not moot an injunctive relief claim simply by voluntarily ceasing the challenged conduct.  He cites Friends of the Earth v. Laidlaw Environmental Services, Inc., 528 U.S. 167, 189 (2000), where the Supreme Court noted: "A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."  Only if the University could establish with absolute clarity that Faulkner would never again be subjected to the broad prohibition on his religious speech would the amendment to the corrective action arguably moot his claim.  Bowman's July 23, 2015 letter contains no

such assurances.  And it suggests that additional complaints would be investigated and acted upon if Faulkner is not sufficiently "mindful of how his [biblical references] can be interpreted by his colleagues...".  The Court rejects Defendants' arguments on standing and mootness.

Faulkner's First Amendment Claim: Defendants argue that Faulkner's First Amendment claim, whether styled as an infringement of his free exercise of religion or as an impairment of his free speech rights, must be dismissed.  They contend that Faulkner was not barred from performing any personal religious practice, that the Leadership presentation was the only occasion on which he presented his "Servant Leadership" lecture, and that this entire lawsuit springs from a single incident that has not been repeated.  Defendants note that while the Sixth Circuit does not appear to have applied Garcetti in the context of a free exercise claim, they urge the Court to apply its reasoning to Faulkner's claim.  They argue that the "corrective action" letter was appropriate and did not infringe any religious practice in which Faulkner wished to engage.

When the government acts as an employer, its powers to regulate speech are clearly broader than its powers to regulate public speech generally.  While the University's power to regulate speech of its employees is broad under Garcetti, it is not without limits.  Faulkner's religious beliefs include daily reading of the Bible, prayers while at work, and references to biblical verse or proverbs during his everyday interactions with people, including his workplace discussions.  Dr. Vincent, Faulkner's supervisor, testified that prior to the incident giving rise to this case, he was never uncomfortable with Faulkner's speech or religious expressions, and that he had never

heard anyone else complain about Faulkner.  (Vincent Dep. at 23, 42-43)  According to Bowman, one anonymous employee felt "uncomfortable" about Faulkner's Servant Leadership remarks, and so the University barred him from using biblical quotations in any "work related interactions."  The "corrective action" effectively prohibited Faulkner from engaging in his normal religious practice of using biblical references or proverbs in his working environment.

Defendants attempt to portray Faulkner's complaints about this broad prohibition on Christian-based biblical references as overblown, and that his subjective impressions of what Bowman's letter said are insufficient to withstand summary judgment.  The Court disagrees.  It is difficult to conceive of a broader prohibition than one limiting speech in "all workplace interactions."  Accepting Faulkner's own description of his Christian faith and religious practices (as the Court must do on summary judgment), this broad ban infringed on his ability to exercise his faith as he had always done, without problem or objection from anyone in any "workplace interaction."  The University has not argued that Faulkner's speech was interpreted by anyone as an official position of the University.  Indeed, Bowman's "corrective action" letter specifically acknowledged that Faulkner made it clear that his comments and his presentation to the Leadership Academy were his own personal views, and not those of the University.

Applying the balancing test of Pickering v. Board of Educ., 391 U.S. 563 (1968) to this claim, the University must show that its interest in this broad prohibition on Faulkner's speech outweighed any interest that Faulkner had in using biblical references and examples in his everyday workplace speech.  Bowman testified that Faulkner made an employee "uncomfortable."  There is no suggestion that anyone

accused Faulkner of harassment on the basis of religious belief or preference, conduct that could well merit discipline and a prohibition on such conduct.  Bowman explained that part of her justification for imposing the prohibition on speech was due to Faulkner's role as a manager, and because "he should know what affects his employees and what doesn't."  (Bowman Dep. at 50)  But there was no allegation that Faulkner was using his supervisory power to harass a subordinate on the basis of his own religious beliefs.  The University's asserted interest in avoiding an employee's discomfort at hearing biblical references (or in another context, hearing references to Buddhist teachings or the Quran, or the principles of atheism) simply and plainly do not outweigh Faulkner's interests in free speech and in the free exercise of his religious principles.  This is especially true in view of Faulkner's lengthy tenure at UC, and the utter lack of evidence that anyone on any previous occasion felt "uncomfortable" enough about Faulkner's speech to complain about it.

The Court concludes that the Defendants are not entitled to summary judgment on Faulkner's First Amendment claim.

Challenges to the University's policies: The University's Discriminatory Harassment Policy (No. 11.02) is the operative policy banning harassment in the University community.  The policy defines "discriminatory harassment" as:

> ... conduct that has the purpose or foreseeable effect of unreasonably interfering with an identifiable individual's work or academic performance or of creating an intimidating, hostile, or offensive work or learning environment for that individual.  It is not necessary that the consequences actually occur, but the test of whether they are foreseeable is to be determined objectively by reference to all the circumstances of the particular case.

(Bowman Dep. Ex. D) Defendants contend that this policy is not unconstitutional based

on vagueness or overbreadth. The University has a duty under law to regulate conduct in order to protect members of its community against purposeful harassment. Defendants reject Faulkner's reliance on <u>Dambrot v. Central Mich. Univ.</u>, 55 F.3d 1177 (6th Cir. 1995), where the Sixth Circuit found a university's harassment policy unconstitutional. That policy, unlike UC's, purported to prohibit any intentional **or** unintentional behavior that subjected someone else to intimidation or a hostile and offensive environment. The court of appeals held that the policy was both overinclusive and failed to clearly and objectively define the contours of the prohibited behavior. Defendants argue that the UC policy regulates purposeful conduct, and conduct that has an objectively foreseeable effect.

Defendants also cite the policy's introduction which expressly recognizes that the University "cannot legally censor speech or punish those who exercise First Amendment rights." (Bowman Dep. Ex. D, Introduction ¶2) They further note that the operative language of its harassment policy mirrors the definition contained in federal regulations barring workplace harassment. See 29 C.F.R. 1604.11(a), defining harassing conduct to include "... conduct [that] has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment."

Faulkner responds that the policy does not clearly define prohibited conduct, nor provide clear standards to guide its enforcement. He argues that no reasonable person in his position could have known that including biblical references in a leadership presentation would purposefully or foreseeably interfere with an employee's performance, much less create an intimidating, hostile, or offensive environment. He

also contends the policy is overbroad because it reaches a substantial amount of protected speech.

Faulkner cites DeJohn v. Temple Univ., 537 F.3d 301 (3d Cir. 2008) which struck down a university's sexual harassment policy as overbroad and vague. The policy in question in DeJohn stated that "... all forms of sexual harassment are prohibited, including . . . expressive, visual, or physical conduct of a sexual or gender-motivated nature, when . . . (c) such conduct has the purpose or effect of unreasonably interfering with an individual's work, educational performance, or status; or (d) such conduct has the purpose or effect of creating an intimidating, hostile, or offensive environment." The plaintiff was a member of the armed forces, and wished to write his master's thesis on issues regarding women in combat and in the military. He alleged that the policy chilled his speech in classroom discussions on these subjects, and subjected him to the real fear that he would be sanctioned for his views. The Third Circuit held the policy was facially overbroad, in that it reached a substantial amount of speech that is protected by the First Amendment. Nor was the policy reasonably subject to a limiting construction that could save it from plaintiff's constitutional challenge.

The Third Circuit considered a challenge to another university's anti-harassment policy in McCauley v. University of the Virgin Islands, 618 F.3d 232 (3d Cir. 2010). The policy banned conduct that causes "emotional distress" which included "... conduct which results in physical manifestations, significant restraints on normal behavior or conduct and/or which compels the victim to seek assistance in dealing with the distress." The court of appeals noted that "conduct" is a broad term that includes speech protected by the First Amendment, as well as non-expressive harassing conduct

that lies entirely outside the protections of the First Amendment. The term "emotional

distress" was entirely subjective, and purported to prohibit speech without any

consideration of whether the speech was objectively problematic.  Id. at 250.  The court

listed a number of hypothetical scenarios that could be implicated by the policy:

> ... a religious student organization inviting an atheist to attend a group
> prayer meeting on campus could prompt him to seek assistance in dealing
> with the distress of being invited to the event; minority students may feel
> emotional distress when other students protest against affirmative action;
> a pro-life student may feel emotional distress when a pro-choice student
> distributes Planned Parenthood pamphlets on campus; even simple
> name-calling could be punished. The reason all these scenarios are
> plausible applications of [the policy] is that the [policy] is not based on the
> speech at all. It is based on a listener's reaction to the speech. The
> Supreme Court has held time and again, both within and outside of the
> school context, that the mere fact that someone might take offense at the
> content of speech is not sufficient justification for prohibiting it.

Id. at 251 (internal citations and quotations omitted).

Here, in similar fashion, Faulkner was accused of violating the discriminatory

harassment policy because, as Bowman conceded, an employee was "uncomfortable"

about his presentation.  The application of the policy is thus premised on the listener's

reaction to speech, not upon any objective standards either defined in the policy or

articulated by Bowman or by the Defendants.  While the policy's introduction recognizes

First Amendment protection for speech, that protection is apparently trumped when a

listener feels uncomfortable (or perhaps experiences "distress") during a campus

presentation.

In contrast to these cases, a colleague within this district recently rejected a

plaintiff's challenge to the sexual harassment policy of Ohio University.  In Marshall v.

Ohio Univ., 2015 U.S. Dist. LEXIS 31272 (S.D. Ohio, March 13, 2015), the plaintiff was

-16-

suspended from the university after an investigation concluded that he had sexually harassed a fellow student by creating a hostile academic environment for her.  The plaintiff repeatedly sent her text messages imploring her to enter into a relationship, messages she had repeatedly rebuffed.  He continued to send texts after she asked him to stop.  He filed suit seeking reinstatement, and alleged that the harassment policy violated his First Amendment rights.  The district court denied his request for a preliminary injunction, finding that he had not shown a substantial likelihood of success on the merits of his First Amendment challenge to the policy.

The policy defined sexual harassment to include "... sexual advances, requests for sexual favors, and other physical or verbal conduct of a sexual nature that is unwelcome and is sufficiently severe or pervasive from both a subjective (the complainant's) and an objective (reasonable person's) viewpoint."  Harassment by creating a hostile environment was defined as

> ... conduct [that] has the purpose or effect of unreasonably interfering with a person's work or academic performance or creating an intimidating, hostile, or offensive environment for working, learning, or living on campus.
>
> The determination of whether an environment is "hostile" is often contextual and must be based on the circumstances. These circumstances could include:
>
> • The frequency of the conduct;
> • The nature and severity of the conduct;
> • Relationship between alleged harasser and subject of the alleged harassment;
> • Location and context in which the alleged conduct occurs;
> • Whether the conduct was physically threatening;
> • Whether the conduct was humiliating;
> • Whether the conduct arose in the context of other discriminatory conduct.
>
> A hostile environment could be created by repeated, unwanted, sexually oriented stares (maintaining eye contact is, of course, acceptable).

-17-

Id. at **3-5.  The university's policies also provided procedural safeguards for anyone accused of sexual harassment, including a neutral fact-finder and the right to present evidence at a hearing.  The district court rejected plaintiff's overbreadth and vagueness challenges to the policy, finding that the policy was narrowly tailored and carefully drafted to balance the university's need to prohibit harassment with an individual's free speech rights.  The policy provided also specific guidance on how the determination of a "hostile" environment would be made, and required both an objective and subjective assessment of the conduct at issue.

The UC policy at issue does not share these qualities.  In addition, despite the policy's express assurance that any complaint of discriminatory harassment will be subjected to a "thorough investigation," a fact finder could conclude that Bowman's investigation was anything but "thorough."  The "corrective action" letter was issued to Faulkner based on one anonymous employee's complaint of discomfort, and despite Faulkner's denial of statements that Bowman later attributed to him.  Faulkner was found in violation of a policy that provided him with no guidance on what speech the University could conclude fell within its definition of harassment.  The Court concludes that Defendants are not entitled to entry of judgment that the discriminatory harassment policy which Faulkner is accused of violating passes constitutional muster under the doctrines of vagueness and overbreadth.

### CONCLUSION

For all of the foregoing reasons, Defendants' motion for summary judgment (Doc. 35) is denied.

SO ORDERED.

-18-

DATED: March 23, 2016                          ____s/Sandra S. Beckwith_____
                                               Sandra S. Beckwith, Senior Judge
                                               United States District Court